UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

IN RE )
) Bankruptcy Case
CHARLES A. GROGAN and ) No. 11-65409-fra11
SARAH A. GROGAN, )
                   Debtors. ) MEMORANDUM OPINION

    The Debtors-in-Possession have submitted a plan to reorganize their Christmas tree farming business. After reviewing the extensive record in this case the Court finds that the proposed plan does not meet the requirements of the Bankruptcy Code, and cannot be confirmed.

## I. BACKGROUND

    Debtors-in-Possession Charles and Sarah Grogan ("**Debtors**") own and operate Silver Bells Tree Farm, located in Marion County, Oregon, where they plant and grow Christmas trees, mostly of the popular Noble fir variety. Although some trees are harvested early for sale as 'table-tops," it generally takes 8-10 years for the trees to mature. At maturity the trees are harvested and sold to a variety of customers, including garden centers, retailers, small chain stores, tree brokers, and "choose and cut" farms.

    Debtors' major secured creditor is Harvest Capital Company (**"Harvest"**). Harvest has a perfected security interest in the Christmas trees, other timber growing on the parcels, and other personal property related to the business. It also holds a perfected mortgage on most of Debtors' real estate, both owned and leased. Harvest's lien extends to the proceeds of its collateral.

MEMORANDUM OPINION-1

Debtors filed their voluntary Chapter 11 petition on October 31, 2011. On November 2 they moved for permission to use Harvest's cash collateral. An interim order was entered which required adequate protection payments to Harvest, as well as two other secured creditors. In April 2012 a final cash collateral hearing was held, at which Debtors and Harvest stipulated that the real estate had a value of $4,750,000. Deducting a $170,000 senior lien, left Harvest's interest therein valued at $4,580,000. The parties also stipulated the timber had a value of $549,000.

The value of the Christmas trees however was contested. After an evidentiary hearing, including expert testimony, the Court found the trees had an average value of $3 apiece "on the stump." As of the time the motion to use cash collateral was filed, there were approximately 941,000[1] established trees which rendered a $2,823,000 value. In addition, there were approximately 75,000 new trees planted in spring 2012, which the Court valued at approximately $177,000, for a total Christmas tree value of $3,000,000. Another secured creditor had a first lien of $187,000, so Harvest's interest in the trees was $2,813,000.

Based on the above values, Harvest's total collateral base was $7,942,000.[2] The Court found there would be a likely 12% ($360,000) per year decline in the value of the tree inventory, and thus ordered, in addition to the payments already made, $30,000 per month adequate protection payments to Harvest going forward. To the extent Harvest had a valid lien on the Christmas tree crop, the cash collateral order granted it "a replacement lien on post-petition accounts receivable and contract rights and on any new trees planted post-petition as provided in 11 USC §552(b)." Final Order on Use of Cash Collateral [doc. # 208] at p. 4. It is undisputed Debtors have made the ordered adequate protection payments, all derived from proceeds of the Christmas trees, and thus from Harvest's cash collateral.

On December 15, 2011, Debtors initiated an adversary proceeding [Grogan v. Harvest Capital Co., et al., Adv. # 11-6276] challenging Harvest's security interest in the Christmas trees. The complaint alleged

---

[1] This, and subsequent values and tree counts, have been rounded for convenience sake.

[2] This figure did not include $118,000 in cash collateral existing when Debtors filed their motion to use cash collateral. Arguably, a certain percentage of this cash was used to replant the new seedlings in spring 2012, whose value the Court did count in Harvest's collateral base.

MEMORANDUM OPINION-2

that the security agreement between the parties did not cover the trees, or alternatively, the financing statement did not properly perfect any security interest. That matter was resolved in Harvest's favor by partial judgment entered in September 2012 declaring that Harvest had a duly perfected unavoidable security interest in the Christmas trees and the proceeds thereof. That judgment is currently on appeal to the Bankruptcy Appellate Panel (**BAP**) for the Ninth Circuit (**"the lien appeal"**). [3]

Initially before the Court for confirmation was Debtors' Amended Plan of Reorganization dated November 29, 2012. Harvest cast a ballot rejecting the plan, and objected to confirmation on multiple grounds. The matter was heard in January, 2013. As part of its post-hearing briefs, Debtors offered a Second Amended Plan of Reorganization ("**Plan**") which addressed an objection by another secured creditor, added language as to payment of United States Trustee's fees, allowed for sale of additional real property and timber, and modified Harvest's treatment.[4] Despite those modifications, Harvest, continued to object..

## II. DISCUSSION

1. Plan Provisions

In general terms, the Plan proposes to continue the Christmas tree operations on a downsized basis, with certain real estate parcels to be sold (and the proceeds used to pay down secured debt) and certain leaseholds left to expire. Debtors expect to reduce the overall farm size from over 600 acres to approximately 420. The Plan is based largely on the assumption that after years of oversupply, the Noble fir Christmas tree market will be facing an undersupply in the next 5-9 years which will in turn drive prices up. Except for de minimis outside sources, the Plan will be funded from Christmas tree proceeds.

The Plan separately classifies Harvest. It amends Harvest's existing promissory note to provide for an initial interest-only payment 30 days from the Plan's effective date, and then beginning in 2014, annual

---

[3] The BAP's docket indicates that the case has been briefed, but not yet argued.

[4] Only redlined excerpts of the Plan are attached to Debtors' Supplemental [opening] [post-] Confirmation Hearing Memorandum [doc. 446] as Exhibit MM. The Court presumes all other provisions of the Plan are identical to those of the First Amended Plan.

MEMORANDUM OPINION-3

payments at 6% interest, on a 25-year amortization schedule with a balloon payment on March 31, 2023.[5] In addition, it contemplates payments on or before March 31, 2014, from sales of land and timber. The Plan however sets no dates certain for the contemplated sales, which may take place as late as the balloon payment date. The Plan also contemplates, but does not commit to, payments from operating surpluses.

A plan proponent has the burden to prove by a preponderance of the evidence that the plan meets all the requirements of 11 USC § 1129(a), (b).[6] United States v. Arnold and Baker Farms (In re Arnold and Baker Farms), 177 B.R. 648, 654-55 (9th Cir. BAP 1994), aff'd, 85 F.3d 1415 (9th Cir. 1996). When there is a rejecting impaired class, as here, the proponent must meet the "cram-down" requirements of § 1129(b). For secured creditors, those are found in § 1129(b)(1), (2). Under § 1129(b)(1), a plan must not discriminate unfairly and be fair and equitable. Harvest argues the Plan is not fair and equitable.

2. The Plan does not treat Harvest "fairly and equitably"

To be fair and equitable, a plan must at a minimum meet the requirements of § 1129(b)(2)(A). Under that subsection, if a secured creditor is not paid in full upon the plan's effective date, a plan must:

> 1) provide for the retention of the creditor's lien, and deliver cash payments equaling at least: 1) the allowed amount of the secured claim; and 2) the present value of the creditor's collateral as of the plan's effective date, § 1129(b)(2)(A)(i); or,
>
> 2) provide that the secured creditor realize the "indubitable equivalent" of its claim, § 1129(b)(2)(A)(iii); or

---

[5] The balloon payment date is ambiguous. Plan § 4.2.1(a) provides Harvest will be paid in full not later than 10 years from the effective date or March 31, 2023, whichever is later. The Plan defines "effective date" as the 60th business day following entry of the confirmation order. As it is now past March 31, 2013, the balloon payment would be due 10 years from the effective date. However § 4.2.1(b) provides the balloon will be paid on or before March 31, 2023. This date is consistent with Debtors' exhibits in support of confirmation, see e.g., Ex. R, and is the date both sides referenced during the proceedings. As such, the Court will use the March 31, 2023, date in its analysis.

[6] Unless otherwise indicated, all subsequent statutory references are to Title 11 of the United States Code.

MEMORANDUM OPINION-4

3) if it proposes the sale of collateral, be free and clear of the creditor's lien, give the secured creditor credit bid rights under § 363(k), provide that the lien attaches to the sale proceeds, and treat such lien on the proceeds in the same manner as paragraphs 1 or 2 above. § 1129(b)(2)(A)(ii).

A. Payment of Secured Claim:

Section 1129(b)(2)(A)(i)(II) requires that to satisfy the fair and equitable standard a plan must provide for "deferred cash payments totaling at least the allowed amount of such [secured] claim." Section 1129(b)(2)(A)(iii)'s "indubitable equivalence" requirement mandates at least as much. Both parties concede that Harvest's claim is undersecured. In most circumstances, Harvest would have an allowed secured claim up to the collateral's value, § 506(a)(1), with the balance of the lien being avoided under § 506(d) and treated as unsecured. First Fed. Bank of Cal. v. Weinstein (In re Weinstein), 227 B.R. 284, 291-92 (9th Cir. BAP 1998). However, secured creditors in Chapter 11 have the option to forsake their un[der]secured claims (and any distribution thereon), and elect under § 1111(b) to have their entire claim deemed fully secured ("**full claim**"), which must then be paid over the course of the plan. Id. at 295, n. 12. The retention of the lien on the full claim offers protection if the collateral appreciates post-confirmation (or the parties by stipulation, or the court, simply undervalued it at confirmation). In re Red Mountain Mach. Co., 451 B.R. 897, 903-04 (Bankr. D. Ariz. 2011). If the appreciated collateral is sold, the § 1111(b) election allows the creditor to bid in its full claim. It also requires a third party to pay the balance of the full claim (as opposed to that of a "crammed down" claim) to clear the lien. Harvest has made the § 1111(b) election.

The parties disagree over the amount of Harvest's full claim. Harvest argues it is $7,903,789. Debtors argue it is $7,426,999. The major disagreement[7] is how to account for adequate protection payments.[8] These payments should be credited against the full claim. However, even accepting for the sake of argument

---

[7] If necessary, the exact full claim amount can be determined in separate claims litigation. For purposes of confirmation, an estimate will suffice.

[8] As of the confirmation hearing, adequate protection payments totaled $338,000. According to their Rule 2015 reports [docs. ##473, 490], Debtors-in-Possession subsequently made the February and March $30,000 payments. Indeed, at this point, the Court presumes they also made the payment due April 15, for a total of $428,000 in adequate protection payments.

MEMORANDUM OPINION-5

Harvest's higher claim amount, the proposed payout over the Plan's life exceeds the full claim, and thus this prong of § 1129(b)(2)(A) has been met.[9]

B. Payment of Present Value of Actual Secured Claim:

Section 1129(b)(2)(A)(i)(II) requires that to be fair and equitable, a plan must provide to a secured claimholder, deferred cash payments "of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property." For undersecured creditors, even those who have made an election under § 1111(b), this means simply that the plan must pay the value of the creditor's collateral as of the plan's effective date (**"actual secured claim"**), with interest. See Countrywide Home Loans, Inc. v. Hoopai (In re Hoopai), 581 F.3d 1090, 1100, n. 8 (9th Cir. 2009) ("value, as of effective date" language in analogous § 1325(a)(5)(B)(ii) creates right to interest). Likewise, § 1129(b)(2)(A)(iii)'s "indubitable equivalence" language requires the same. Crocker Nat'l Bank v. Am. Mariner Indus., Inc. (In re Am. Mariner Indus., Inc.), 734 F.2d 426, 433 (9th Cir.1984), abrogated on other grounds, United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd., 484 U.S. 365, 108 S. Ct. 626 (1988) (indubitable equivalency subsumes the time value of money).

C. Value of Harvest's Secured Claim:

The value of the secured claim is limited to the value of the collateral. The parties differ on the value of Harvest's collateral as of the Plan's effective date. Harvest claims it is $7,815,505, while Debtors argue it is $6,788,788. The parties agree the real estate's value has not depreciated since the cash collateral proceedings. They also agree that because one of the parcels (Sunnyview) was sold during the pendency of the case,[10] the $500,000 received at the sale must be deducted from Harvest's collateral base,[11] rendering the

---

[9] If Debtors prevail on the lien appeal, the enumerated plan payments may not exceed the full claim. However, Debtors have made clear they will fund the Plan to make up any deficiency. See Plan at ¶ 4.2.2(c). The evidence at hearing indicated this additional amount would be added to the balloon.

[10] The Sunnyview sale was for the land only and included a lease back to permit harvest of the trees.

[11] At the time of the confirmation hearing, the order approving the Sunnyview sale was on appeal, and
(continued...)

MEMORANDUM OPINION-6

value of Harvest's real property collateral at $4,080,000. They disagree on the value of every other collateral category.

As to the timber, at a January 3, 2013, pretrial conference Debtors and Harvest stipulated that the $549,000 value found at the cash collateral hearing, (which was itself based on a stipulation), would also apply at confirmation. Debtors now seek to parse the stipulation to exclude $214,000 in "pre-merchantable" timber, that is, timber not presently old or large enough to be harvested and sold. This distinction was not made part of the agreement presented to the Court, nor contemplated by the Court when it accepted the stipulation. Debtors may not make the distinction after the fact.

First, the Court relied on the prior stipulated value specifically in setting adequate protection and generally in deciding the earlier cash collateral motion, as well as a motion for relief from stay filed by Harvest and heard at the same time as the cash collateral motion. Further, as discussed below, Debtors have argued that because Harvest's overall collateral base did not deteriorate throughout the case, the adequate protection payments should be applied directly against the actual secured claim. Debtors cannot have it both ways. Either the collateral base, including the $549,000 in timber remained steady, or if it is now worth only $335,000, the $214,000 reduction should be applied to compensate for the decline in the timber's value instead of being applied to the actual secured claim. Either way, the result is the same and the $214,000 must be counted. Finally, Debtors' "pre-merchantable" v. "merchantable" dichotomy falls flat when the same is applied in another context, that is, the Christmas tree inventory itself. Surely, of the over 800,000 trees on the stump, the majority are "pre-merchantable"– that is, not yet ready for harvest and sale – and it is beyond doubt they have value. For all the above reasons, the full $549,000 timber value will be counted towards Harvest's secured claim.

As for the Christmas trees, again, at the January 3 pretrial conference, Debtors and Harvest stipulated to the value found at the cash collateral hearing, that is, $3 per tree plus something a bit less for new

---

[11](...continued)
the net proceeds were still in escrow. Since then, the appeal has been dismissed, and presumably the proceeds have been paid to Harvest.

MEMORANDUM OPINION-7

plantings, for a total value of $3,000,000.[12] Deducting the $187,000 senior lien, yields a $2,813,000 value for the trees.

Finally, Debtors argue, without supporting authority, that the value of cash-on-hand collateral should be the $118,000 on hand when the case was filed. Harvest responds that the value is the $187,000 in encumbered cash as of the confirmation hearing. Debtors contend the $187,000 will have largely dissipated by the time the Plan becomes effective 60 days after any confirmation order. Be that as it may, the Court must make its findings based on the evidence before it at the confirmation hearing. Further, using the petition date is inappropriate given § 1129(b)(2)(A)(i)(II)'s directive to compute the actual secured claim as of the Plan's effective date. Finally, there is scant cause for concern about dissipation: Debtors are operating under a strict cash collateral budget designed to preserve value. Thus while some of the cash will have been spent as of the Plan's effective date, the vast majority of those funds will either have been paid to Harvest as adequate protection or put back into the tree farm.

Totaling all of the above yields $7,629,000 as Harvest's gross actual secured claim. Debtors argue certain credits are appropriate, including $90,000 paid to Harvest as the result of settlement of a third party claim in the adversary proceeding, and $428,000 in adequate protection payments. See n. #**8**, supra. In support of both deductions, Debtors argue that Harvest's collateral base, and in particular the Christmas tree inventory has not depreciated and that, under authorities such as Weinstein, 227 B.R. at 296-97, the payments should be applied to reduce the value of Harvest's actual secured claim. On the other hand, Harvest relies on precedent holding that if cash collateral derived from the original collateral's proceeds, is used for adequate protection, there should be no further credit against the actual secured claim, but rather the unsecured deficiency should be reduced. See e.g., In re Geijsel, 480 B.R. 238, 266-68 (Bankr. N.D. Tex. 2012). It further relies on the Court's cash collateral ruling that the Christmas tree inventory would likely depreciate 12%, and thus the adequate protection ordered was solely to compensate for this decline.

---

[12] Harvest computes the $3,000,000 tree value at $3 per tree on a current inventory of 805,000 trees, plus $587,000 in receivables derived from the 2012 harvest. This does not take the prior lien into account.

MEMORANDUM OPINION-8

On this latter issue, the Court now has the benefit of hindsight, and by Harvest's own figures and admissions, the tree inventory's value, as well as the other collateral's, has held steady throughout the case. On the former issue as to how to credit adequate protection payments made from cash collateral, the Court need not take a position because even allowing the $518,000 in deductions, which would render an actual secured claim of $7,111,000, the Plan cannot be confirmed for the reasons set forth below.[13]

---

[13] The adequate protection concepts can be illustrated as follows. Suppose at the time a motion to use cash collateral is filed, the debtor owns collateral worth $100, which secures $120 in debt. Adequate protection payments of $2/month are ordered. Five months later, when the case reaches confirmation, the collateral's value has slipped to $90. For § 1129(b)(2)(A) purposes, the creditor's actual secured claim would be $90, and its unsecured deficiency claim, $20. The $10 ($2 x 5 months) in adequate protection payments would have fulfilled its function of guarding the original $100 security value, and would thus not further be applied against the $90 secured claim.

Changing the example, suppose the collateral was worth $100 at confirmation. The concept of adequate protection only protects against loss in value of a creditor's collateral base. Weinstein, 227 B.R. at 246. In the example, there would be no loss. The creditor would still have $100 in collateral plus the unencumbered $10. To prevent a windfall, the $10 would be treated as an advance payment and credited against the $100, which would reduce the actual secured claim to $90, while preserving the $20 deficiency unsecured claim. As Weinstein notes, this is true even after a § 1111(b) election. That is, the collateral value (i.e. actual secured claim) is reduced, instead of the "unsecured" portion. Id. at 297.

Suppose however the $10 came from encumbered cash (derived either from rents or proceeds of the original collateral, see § 552(b)). It appears the majority of courts would not set this payment off further against the actual secured claim as of the effective date, but instead would set it off against the deficiency, rendering, using the latter example, a $100 actual secured claim, and a $10 deficiency. See 7 Collier on Bankruptcy ¶ 361.03[2][a] (Alan M. Resnick & Henry J. Sommer eds., 16th ed.) (collecting cases). This view separately classifies the cash, (as distinct from the original collateral). It recognizes that as the cash accumulates the actual secured claim increases, thus reducing the unsecured deficiency, and when the cash is paid (or surrendered) to the creditor, the actual secured portion is thereby reduced on a dollar for dollar basis, with the deficiency then increasing. Because with each "adequate protection" payment, the actual secured claim is being reduced, the courts reason it is inappropriate to reduce it again. The minority view would allow such further reduction, arguing the only interest being protected is the original $100 collateral value, which has not declined. See e.g., In re Reddington/Sunarrow Ltd. P'ship, 119 B.R. 809, 813-14 (Bankr. D. N. M. 1990). Although Debtors argue Weinstein adopts the minority view, that may not be the case. There, it appears the "adequate protection" payments the court setoff came from unencumbered cash, as the collateral was the debtor's personal residence, 227 B.R. at 288, and there is no indication the payments came from its "rents." As such, it could well be that how to account for adequate protection payments made with cash collateral derived post-petition from the original collateral's proceeds or rents, is an open question in this Circuit.

MEMORANDUM OPINION-9

D. Applicable Interest Rate:

In Till v. SCS Credit Corp., 541 U.S. 465, 124 S. Ct. 1951 (2004), a Chapter 13 case, the Supreme Court announced a "prime plus" approach to setting interest rates to determine the present value of secured claims. Under this approach, the bankruptcy court should take the prime rate (currently 3.25%) and adjust for risk, based on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan. The creditor has the burden of proving a higher rate than prime is appropriate. Id. at 484-85, 124 S. Ct. at 1964. This court has approved use of the Till rate in Chapter 11. In re Waugh, Case #03-67809-fra11 (Bankr. D. Or. October 19, 2004) (unpublished) (Alley, J.). The BAP has held that courts should use the market rate if there is an "efficient market" but if there is no such market, the Till rate should be applied. In re VDG Chicken, LLC, 2011 WL 3299089 at *8 (9th Cir. BAP 2011). The Plan proposes a 6% interest rate. Both Debtors' expert, Michael Butler, and Harvest's expert, Robert Timm, agreed that a 6.5% rate was appropriate, and the Court concurs. Debtors have agreed to amend the Plan to provide for same, and as such, have met the "present value" prong of § 1129(b)(2)(A).[14]

E. Lien Retention and Post-Petition Use of Cash Collateral:

Section 1129(b)(2)(A)(i)(I) requires that a plan provide that a secured claimholder "retain the lien[ ] securing [its] claim[ ] . . . to the extent of the allowed amount of [its] secured claim[ ]." Likewise, § 1129(b)(2)(A)(ii) requires that liens attach to the proceeds of free and clear sales and that the treatment of those proceeds conform to either the lien retention requirement of subsection (i) or the indubitable equivalency requirement of subsection (iii).

Harvest is secured in the Christmas trees and their proceeds. Those proceeds are Harvest's "cash collateral." See §363(a). The Plan proposes to use this cash to pay operating expenses, liens senior to

---

[14] The Plan refers to Harvest as having both a secured and unsecured claim. Debtors explain this is to clarify that despite the § 1111(b) election, only the actual secured claim accrues post-confirmation interest. However, after the election, it is more accurate to classify the full claim as secured. To compensate however for the requirement that only the actual secured claim accrues interest, the full claim should be amortized at a below-market interest rate. 7 Collier on Bankruptcy ¶ 1111.03[6][b] (Alan M. Resnick & Henry J. Sommer eds., 16th ed.). Thus, for example, here, a 6.5% interest rate on $7,111,000, (actual secured claim) would equate to an approximate 6.03% rate on $7,426,999 (Debtors' computation of the full claim).

MEMORANDUM OPINION-10

Harvest, and Harvest itself. Harvest has no objections to those expenditures. The Plan also proposes to use cash collateral to pay an estimated $400,000 in Debtors' counsel's fees,[15] as well as approximately $134,000 to general unsecured creditors[16] before full payment to Harvest. Harvest objects to these payments as violating the "lien retention" requirement.

There is caselaw construing the analogous provision in Chapter 12, § 1225(a)(5)(B)(i), which interprets the lien retention requirement as only requiring "retention" to the extent of the secured claim. In other words, the lien need not stay on all of the collateral, and thus cash collateral may be spent, so long as the remaining collateral "retained" will ensure payment of the balance due on the secured claim (i.e. the remaining collateral adequately protects the creditor's position). In re Wilson, 378 B.R. 862, 882 (Bankr. D. Mont. 2007). On the other hand, most of the Chapter 11 caselaw holds use of cash collateral to pay junior third parties means the lien on the cash is not "retained." There is however not a blanket prohibition on such use. Instead, the courts have turned to § 1129(b)(2)(A)(iii)'s "indubitable equivalent" standard to determine whether to allow the proposed use. See, e.g., F.H. Partners L.P. v. Inv. Co. of the S.W., Inc. (In re Inv. Co. of the S.W.), 341 B.R. 298, 318-19 (10th Cir. BAP 2006) (partial release of lien on lots, with proceeds redirected to operating expenses and other creditors); In re Saguaro Ranch Development Corp., 2011 WL 2182416 at *7 (Bankr. D. Ariz. June 1, 2011) (same).

---

[15] The $400,000 figure was an estimate set forth in the Report of Administrative Expenses [doc. #430] filed shortly before the confirmation hearing. Through November 30, 2012, however, Debtors' counsel had incurred over $355,000 in fees and costs. Application for Interim Fees [doc. #461]. Given the proceedings since the end of November, and in particular the preparation for and appearance at the multi-day confirmation hearing, as well as the briefing in the lien appeal, the Court considers the $400,000 estimate on the extreme low end. In any case, the attorneys' fees are administrative expense claims, §§ 503(b)(2), 507(a)(2), which must be paid in full in cash on the effective date, unless the claimholder agrees otherwise. § 1129(a)(9)(A). Debtors' counsel has agreed otherwise. Although the Plan does not list the agreement, counsel has represented the firm is willing to accept payments over the next 5-8 years. See Report of Administrative Expenses.

[16] Under the Plan, unsecured creditors with claims of $20,000 or less will receive 75% over two years. Debtors estimate approximately $15,000 will be paid on these claims. Unsecured claims above $20,000 will receive 20% over 10 years. Debtors estimate approximately $119,000 will be paid on those claims.

MEMORANDUM OPINION-11

Indubitable equivalency requires that the plan "insure the safety of the principal," Am. Mariner Indus., Inc., 734 F.2d at 433, which in this context means insuring any remaining collateral will cover any remaining actual secured claim should the proponent default. In shorthand, the creditor's collateral must remain adequately protected throughout. The creditor's risk exposure cannot increase because of the use of its collateral. Wiersma v. O.H. Kruse Grain and Milling (In re Wiersma), 324 B.R. 92, 111-12 (9th Cir. BAP 2007), aff'd in pertinent part, rev'd on other grounds, 227 Fed. Appx. 603, 2007 WL 1073782 (9th Cir. 2007) (aff'g); 483 F.3d 933 (9th Cir. 2007) (rev'g)). The plan proponent must demonstrate the protection provided leaves "no reasonable doubt" the creditor will receive the full value of what it bargained for. Inv. Co. of the S.W., 341 B.R. at 319.

Such protection can come from an equity cushion, Woods v. Pine Mountain, Ltd. (In re Pine Mountain, Ltd.), 80 B.R. 171, 174-75 (9th Cir. BAP 1987), or substitute collateral. In re Country Coventry Commons, 149 B.R. 109, 114 (Bankr. E.D. Mich. 1992); cf., Security Leasing Partners, L.P. v. ProAlert LLC (In re ProAlert, LLC), 314 B.R. 436, 443 (9th Cir. BAP 2004) (considering pre-confirmation use of cash collateral but citing Country Coventry's rationale with approval, even as it pertained to post-confirmation use). It can also be in the form of cash payments. Country Coventry, 149 B.R. at 114.

Here, Harvest is undersecured, and there is no equity cushion. Further, Debtors have offered no new or substitute collateral. Cash derived from tree sales, even the built-in reserve in Debtors' operating budget, is not substitute collateral, as Harvest is already secured therein. Debtors' plan payments will decrease the balance due on the actual secured claim and thus reduce risk slightly, but the payments are on a 25-year amortization over the 10-year life of the plan, so it will take at least four years before the principal balance is reduced in an amount commensurate with what Debtors propose to spend on administrative and other expenses. In the meantime, the cash is being diverted.

Harvest of course will remain secured in the land, timber, trees, and their proceeds. Debtors argue their tree inventory will be increasing in value because of the overall market's under-supply of Noble fir, and that this increased value will provide Harvest protection. As discussed below, the Court has doubts about Debtors' projections. However, even assuming for argument's sake the projections are not speculative, that

MEMORANDUM OPINION-12

does not by necessity mean Harvest will not be left more exposed. The holding in United States v. Arnold and Baker Farms (In re Arnold and Baker Farms), 85 F.3d 1415 (9th Cir. 1996) illustrates the point. There, the debtor proposed "dirt for debt" treatment of its major secured creditor. The acreage to be transferred to the creditor in satisfaction of its claim was less than half the lender's total secured acreage. Under the plan, the lender's lien would be stripped from the retained acreage. That property would then be used for other plan purposes such as paying professionals' fees and general unsecured creditors. The bankruptcy court confirmed the plan as giving the lender indubitable equivalency because it found the value of the acreage to be transferred exceeded by almost $250,000 the amount of the creditor's secured claim. Of note, the Ninth Circuit did not find the bankruptcy court's valuation clearly erroneous. Nevertheless it affirmed the BAP's reversal of the bankruptcy court. In doing so, it recognized the inherently ephemeral value of real property. It then reasoned that recourse to less than half one's originally-bargained-for collateral did indeed increase the lender's risk, and would not be "completely compensatory" as indubitable equivalence requires. Id. at 1422. Likewise here, given amongst other things, that Debtors' intend to reduce their tree inventory by almost 200,000[17] over the next 10 years, Harvest's exposure will indeed be increased by the diversion of half a million dollars of its collateral. As such, the Court cannot find Debtors have met their burden of proof under § 1129(b)(2)(A).

F. Length of Payout/Balloon Payment:

When the Chapter 11 was filed, Harvest held two secured notes, each of which was amended in September, 2009. One, at $5,500,000 principal drew interest at 10.5%, with annual payments of $627,669 and a balloon of $4,280,933 on September 15, 2021. The other, for $1,500,000 principal, was at an adjustable rate of 5.5% (550 basis points) over the 3-month LIBOR as that rate was adjusted quarterly. Annual interest and partial principal payments were amortized over 22 years, with a balloon, again on September 15, 2021. The Plan seeks to lower the notes' interest rates and annual payments, and extend the balloons by 19.5 months, all the while using Harvest's cash collateral. Such use for 10 years, with, as

---

[17] Debtors project an inventory of 850,000 trees in 2013, declining to 655,000 in 2023.

MEMORANDUM OPINION-13

discussed below, problematic balloon financing, combined with farming's multiple uncertainties, simply transfers to Harvest too much risk to be fair and equitable. See In re Orchards, Village Investments, LLC, 2010 WL 143706 at *20-21 (Bankr. D. Or. January 8, 2010) (even if feasible, plan which proposed balloon after seven years not fair and equitable when plan proponent proposed to "speculate on an uncertain future lending environment not only with their own funds, but with [the lender's] money as well.").

3. The plan is not feasible

Section 1129(a)(11) requires that the Court find "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . ." This is generally known as the feasibility requirement.

> Feasibility requires only that the debtor demonstrate that the plan has a reasonable probability of success. The Code does not require the debtor to prove that success is inevitable or assured, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility. The debtor [however] cannot confirm a plan that is a visionary scheme which promises more than the debtor can deliver.

Beal Bank USA v. Windmill Durango Office, LLC (In re Windmill Durango Office, LLC), 481 B.R. 51, 67 (9th Cir. BAP 2012) (internal quotations and citations omitted).

Bankruptcy courts consider several factors when evaluating the feasibility of a plan, including:

> (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

Wiersma, 324 B.R. at 113 (quoting In re Sagewood Manor Assocs. Ltd. P'ship, 223 B.R. 756, 763 (Bankr. D. Nev.1998)).

> If a final payment, in the form of a "balloon" payment, is proposed to come from new financing to be acquired by the Debtor in the form of some new lending vehicle, then proof of feasibility is necessary. Whether that balloon payment can likely be made, and new financing acquired, requires credible evidence proving that obtaining that future financing is a reasonable likelihood.

In re Seasons Partners, LLC, 439 B.R. 505, 515 (Bankr. D. Ariz. 2010) (internal citations omitted).

MEMORANDUM OPINION-14

The Plan's central assumption is that the market price of Noble fir Christmas trees will increase, and stay at the increased level for the Plan's duration. Starting at $12 per tree in 2013, Debtors project a dollar per year increase until 2018, when they project the market will level off at $17 per tree. The Plan also depends on sales volume projections. As the graph below indicates, Debtors' recent projections in these areas have proved inaccurate.

|  | Projected Sales/Price per tree |  | Actual Sales/Price per tree |  |
| --- | --- | --- | --- | --- |
| 2008 | 186,221 | $14 | 96,898 | $10.38 |
| 2009 | 150,000 | $12 | 129,565 | $8.66 |
| 2010 | 140,000 | $12 | 114,886 | $10.26 |
| 2011 | 150,000 | $13[18] | 131,346 | $11.12 |
| 2012 | 130,000 | $12.50 (revised to $11.50) | 109,229 | $11.76 |

Debtors' explanations for the shortfalls ranged from varying market conditions over which they had no control, to loss of an anticipated account with a major regional grocery chain, to intentional holdbacks hoping to get better prices the next year. There is no evidence to suggest (nor can there be) that these conditions beyond a farmer's control will not recur. In contrast, Harvest's expert, Edward Steigerwaldt testified that the projected undersupply may not materialize to the extent Debtors hope, because other tree farmers have (and will continue to) fill the market deficit by planting more Noble firs. In that event, Nobel fir prices after 2017 could actually decline in response to increased supply, instead of staying level at $17 per tree.[19]

Even assuming for argument's sake Debtors make it through 2022 without default, the balloon payment in 2023 appears to be an insurmountable hurdle. Amortizing the actual secured claim of 7,111,000 at 6.5% interest on a 25-year schedule, and even assuming a $776,000 payment representing the proceeds of

---

[18] These 2011 volume and price projections were made in January, 2010.

[19] Mr. Steigerwaldt also questioned Debtors' husbandry practices, concluding their trees would not on average bring premium prices because they were not of premium quality. He critiqued Debtors' inventory methods as not being the industry standard, and doubted their inventory projections, concluding they had both overestimated the current tree count, and underestimated seedling mortality and cullage rates. All of which led him to conclude Debtors could not perform their plan as projected.

MEMORANDUM OPINION-15

the Canyon parcel and all the merchantable timber is made on March 31, 2014, as the Plan projects, the Court computes the balloon at approximately $4,932,000. Debtors project upwards of $1 million in cash-on-hand to apply towards that payment. However the $1 million figure is inflated, as it is based on $300,000 less principal to be paid to Harvest and .5% less interest. It is also based on Debtors meeting their price and volume projections, which as discussed above is problematic.[20] A more conservative cash-on-hand figure Debtors could dedicate to the balloon without jeopardizing operations, would be somewhere between $100,000-$200,000. Deducting that from $4,932,000 yields $4,732,000-$4,832,000. There is no credible evidence that financing that amount is a reasonable likelihood. Seasons Partners, 439 B.R. at 515.

Both financial experts testified Debtors could only borrow 50% of the real estate/timber's value. If that value remained constant, it would be worth approximately $3,831,000 in 2023,[21] which would only support a $1,915,500 loan. Debtor's expert Mr. Butler, testified that Debtors could also use their Christmas trees as additional collateral. Harvest's expert, Mr. Timm disagreed, opining Debtors would be accessing the "hard money" market, which only offers real estate secured loans. Even assuming the Christmas trees could be used as additional collateral, their value would still not make up the difference needed to pay off Harvest.[22]

The Plan does provide that if necessary, Debtors will sell off portions of the farm to make the balloon. At the above values, and factoring in sales costs and commissions, they would need to sell most of the farm's assets. Debtors' son Casey Grogan testified he might be interested in buying the farm at the Plan's end. However, no concrete evidence was adduced as to his financial wherewithal. Further, no evidence of other prospective marketing plans was offered. Finally, this Court will not bless a plan that at best will end either

---

[20] As part of those projections, Debtors estimate an additional $725,000 total pay-down from operating surpluses in 2019-2022.

[21] $4,228,000 (total real estate value on effective date) minus $170,000 (Livingston parcel sold during plan) minus $441,000 (Canyon parcel sold during plan) plus $549,000 timber value on effective date) minus $335,000 (timber sold during plan)=$3,831,000.

[22] Debtors project a 655,000 tree inventory in 2023, which at current $3 per tree values would be worth $1,965,000, 50% of which is $982,500. Again, even assuming values increase, they would not do so at a rate that would fully fund a take-out loan.

MEMORANDUM OPINION-16

with liquidation of the Debtors' business with only speculative equity remaining, or as argued by Harvest, another Chapter 11 filing, 10 years down the road.

There is one scenario by which the Plan could be feasible: if Debtors prevail on the lien appeal. If the appeal is successful, Harvest's actual secured claim would be reduced to below $4.3 million, and Debtors' chances of making materially reduced annual payments as well as a reduced balloon would increase substantially. Success on appeal would also moot the cash collateral/lien retention issues discussed above, as Harvest's lien would no longer attach to the trees or their proceeds. However, this Court finds it more likely than not the lien judgment will be affirmed. The Court finds the opinion underlying the judgment an accurate exposition of the law as applied to the facts there at bar. See Sherman v. Harbin (In re Harbin), 486 F.3d 510, 520 n. 7 (9th Cir. 2007) (court must consider in its feasibility analysis, the possible outcomes of pending litigation (including appeals), taking into account the plan proponent's likelihood of success). Moreover, even were Debtors successful in knocking Harvest's lien off the trees, Harvest could then have a substantial unsecured claim, implicating the same "fair and equitable treatment" concerns discussed above. Confirmation of the plan would still be unlikely.[23]

Based on the foregoing, the Court finds that the Debtors have not met their burden to show the Plan has a reasonable probability of success.

### III. SUMMARY AND CONCLUSION

The Plan proposed by the Debtors-in Possession fails to meet the confirmation requirements set out in Code § 1129:

– The Plan proposes to employ cash collateral for purposes other than repayment of the secured party's claim, without adequate protection.

– The plan requirement that the secured creditor wait 10 years for payment in full imposes an unjustifiable risk, and is neither "fair and equitable" nor the "indubitable equivalent" of the creditor's bargained-for rights.

---

[23] The Court expresses no opinion here as to whether the § 1111(b) election can be withdrawn if the Court's decision respecting Harvest's security interest is reversed.

MEMORANDUM OPINION-17

1. – There is insufficient evidence that the Debtors will be able to sell their products over the life of the plan at the prices they predict.

2. – The Plan calls for a large balloon payment of the principal secured claim at the end of 10 years, with insufficient evidence that the Debtors will be able to raise the necessary funds either through sale of real property or new borrowing.

Given these findings, the plan cannot be confirmed.

In earlier proceedings Harvest proposed to file a plan of its own. The Court discouraged the idea, stating that it would not act on a creditor's plan until the Debtors' plan had been considered. Since that has now occurred, Harvest is entitled to submit its plan if it elects to do so. Harvest should notify the Court and interested parties of its election to file a plan within 21 days of the date of the order denying confirmation. The plan itself, and a disclosure statement, should be filed within 28 days thereafter.

If Harvest does not elect to file a proposed plan, the Court will enter an order requiring the Debtors to show cause why the case should not be converted or dismissed.

This opinion constitutes the Court's findings of fact and conclusions of law under FRBP 7052. Counsel for Harvest shall prepare and circulate an order consistent with this opinion, and lodge it with the Court within seven (7) days of the date this opinion was filed.

FRANK R. ALLEY, III
Chief Bankruptcy Judge

MEMORANDUM OPINION-18

Case 11-65409-fra11    Doc 497    Filed 04/26/13