UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| IN RE ) | |
| ) | Bankruptcy Case |
| CHARLES A. GROGAN and ) | No. 11-65409-fra11 |
| SARAH A. GROGAN, ) | |
| ) | MEMORANDUM OPINION |
| Debtors. ) | |

This matter comes before the Court on Debtors' Third Amended Plan of Reorganization (**Plan**), as well as the Court's order to show cause regarding dismissal or conversion. The matters were heard on August 28 and 30, 2013. Because a pending sale is crucial to Debtors' reorganization, the Court is issuing an expedited ruling.

This Chapter 11 case has been pending since October 31, 2011. Debtors are Christmas tree farmers seeking to reorganize. For background, the Court refers the parties to its Memorandum Opinion entered April 26, 2013, denying confirmation of Debtors' Second Amended Plan. In re Grogan, 2013 WL 1788024 (Bankr. D. Or. April 26, 2013). After denying confirmation, the Court gave Debtors' largest secured creditor, Harvest Capital Company (**Harvest**) an opportunity to file its own plan, which Harvest declined. The Court then held a show cause hearing regarding dismissal or conversion. The Court took no action on the show cause and gave Debtors until July 19, 2013, to file a supplement to their previously filed amended disclosure statement and a further amended plan. The Court advised that any amended disclosure statement would be conditionally approved and a combined disclosure statement/confirmation hearing set.

MEMORANDUM OPINION-1

Debtors timely filed the Plan and Supplement, see Doc. #547, to their Amended Disclosure Statement (**Disclosure Statement**). The Court conditionally approved the Disclosure Statement, and on August 28, 2013, conducted a combined hearing.

As a preliminary matter, the Court overrules Harvest's objections to the Disclosure Statement. Although objections to the bases of collateral/asset values and the depth of information as to plan implementation costs, were noted in its memorandum in opposition to confirmation, see Doc. #566, p.3, Harvest did not seriously argue these points at hearing, most likely because its concerns had been adequately addressed such that it proceeded to litigate confirmation issues over two days. In any event, the Court finds the extensive disclosures in this case meet the "adequate information" requirements of 11 U.S.C. § 1125.[1]

Turning to issues under § 1129, for the following reasons, the Plan may be confirmed, with the amendments noted below.

**Plan Overview**:

The Plan significantly varies earlier plans in that it proposes to liquidate most of the Christmas tree farm. Debtors, with their son Casey's assistance, will continue to operate. However, they will also sell off six major parcels of land, leaving them greatly reduced holdings. Some sales will include trees on the stump, while others will allow Debtors to harvest the trees through leasebacks or other arrangements. There is currently a pending sale for three parcels, namely, Markin (71 acres), Rock Pit (103 acres), and Canyon (440 of 600 acres). The sale is set to close October 1, 2013. Prior to the confirmation hearing, Debtors moved to sell these parcels free and clear of liens. Because the sale coincided with confirmation, the Court ruled that it would consider the sale within the context of confirmation.

Because they are downsizing operations, Debtors propose a reduced planting schedule, mainly to assure a crop on the parcels remaining after the planned liquidation. However to garner sufficient proceeds to make their plan payments, their harvest schedule remains robust, averaging slightly over 115,000 trees per year. General unsecured creditors are to receive a 20% dividend on March 31, 2019. Treatment of the two

---

[1] Unless otherwise noted, all subsequent statutory references are to Title 11 of the United States Code.

MEMORANDUM OPINION-2

main secured creditors is discussed in detail below. Debtors' counsel has agreed to defer payment of its fees (now approaching $575,000) until after Harvest is paid, except for those fees allowed under § 506(c) and those paid out of non-cash collateral.

**Harvest's Treatment**:

Under the Plan, Harvest will receive a new note amortized over 25 years at 6.5% interest with a balloon payment on or before March 31, 2019. Debtors will make annual payments on March 31st of each year, with the first payment interest-only. In addition, Debtors will make lump sum payments of $200,000, $400,000, and $400,000 on March 31, 2016, 2017, and 2018 respectively. Further, Debtor will periodically pay the net proceeds of the above-described real property sales as well as proceeds from sales of merchantable timber. If the real properties aren't sold by June 1, 2016, Harvest may elect to foreclose thereon. The Plan preserves Harvest's right to credit bid. Debtors propose to make the balloon payment with a combination of cash on hand, and either refinancing or sale of additional parcels. As with the prior plan, Harvest has made a § 1111(b) election. Also, as before, Harvest is an impaired creditor who voted to reject the Plan. Accordingly, the "cram-down" standards of § 1129(b)(2)(A) apply.

Payment of "Full Secured Claim":

Because of the § 1111(b) election, payments under the Plan must equal the amount of Harvest's claim, which is deemed fully secured (**full claim**). Grogan, 2013 WL 1788024 at *3. The Court will determine the full claim's exact amount in the claims allowance process. However, to determine feasibility and compliance with §1111(b), it must estimate the claim. On July 31, 2013, Harvest filed an amended proof of claim for $8,110,225.09. This included over $870,000 in post-petition legal fees,[2] and a credit for the Sunnyview sale and settlement proceeds, as well as $618,500 in adequate protection payments. Debtors have, for confirmation purposes, not objected to the amounts in the proof of claim. Since then, Debtors have paid an additional $30,000 in adequate protection, leaving a full claim balance of $8,080,225.09 for

---

[2] Even though Harvest is under-secured, by virtue of its § 1111(b) election it may claim post-petition legal fees as part of its full claim. In re Warkinton, 461 B.R. 636, 641 (Bankr. D. Or. 2011). Again, determination of the allowed amount of those fees is reserved for further proceedings.

MEMORANDUM OPINION-3

confirmation purposes.[3] Because the proposed plan payments equal or exceed that amount, Debtors have met § 1129(b)(2)(A)(i)(II) and/or (iii).

Payment of Present Value of Actual Secured Claim:

In addition to paying the full claim, Debtors must pay the present value of Harvest's interest in the estate's interest in property as of the Plan's effective date (**actual secured claim**). § 1129(b)(2)(A)(i)(II). This requires an evaluation of Harvest's collateral. As of the confirmation hearing, Debtors had $90,000 in cash collateral on deposit. The parties agree the real estate ($4,080,000)[4] and merchantable timber ($549,000) have held their values as of the effective date. The parties also agree the seedlings planted in 2013 should be valued at $.50 each, which computes to a $52,750 value.

With small variations, the parties agree the trees on the stump have retained their value at $3.00 per tree, although Debtors believe the $3.00 encompasses non-saleable trees. The main disagreement is how many trees are presently on the farm. Harvest urges the Court to adopt its expert, Mr. Steigerwaldt's estimation of 805,508 trees presently on the stump, with 770,884 of those saleable. Debtors urge a tree count of 891,494. Mr. Steigerwaldt's count came from a sampling technique which he testified was widely used in the industry, and described in detail in the first confirmation hearing. Debtors' count came from their records of trees planted in each field minus an historical cullage rate. Casey Grogan testified this methodology was standard in the local Christmas tree industry. The Court adopts Debtors' count as being more reliable as their record-keeping has proven both detailed and accurate throughout the case. Multiplying 891,494 by $3.00 yields $2,674,482, from which BTN of Oregon, Inc.'s $187,000 senior lien must be deducted, to render a

// // //

// // //

---

[3] Any post-August 28th hearing payments should also be credited against the full claim.

[4] The real estate's value of $4,750,000 has been reduced by $500,000 representing the Sunnyview parcel which was sold during the case, and by $170,000 representing Demeter Ag., LLC's senior lien on the North Livingston parcel.

MEMORANDUM OPINION-4

$2,487,482 value of Harvest's Christmas tree collateral as of the effective date. Adding up all the assets pledged to Harvest yields a total collateral value of $7,259,232 as of the effective date.[5]

Debtors argue certain credits are appropriate, namely the $90,000 paid to Harvest as settlement of the third party claim in the adversary proceeding, and the $648,000 in adequate protection payments. Turning to the latter, there is no dispute the adequate protection payments came solely from Harvest's cash collateral and all the cash was the proceeds of Debtors' pre-petition tree inventory. Given those facts, the Court must now address an issue left open in its prior opinion: that is, should payments made from post-petition cash collateral be credited against the amount of the actual secured claim as of the plan's effective date? See Grogan, 2013 WL 1788024 at *5, n 13. The answer is that they should not be, because § 552(b) operates to augment Harvest's security interest with such cash proceeds. In re Geijsel, 480 B.R. 238, 265-268 (Bankr. N.D. Tex. 2012); In re Arden Properties, Inc., 248 B.R. 164, 169-170 (Bankr. D. Ariz. 2000).

To illustrate, if Harvest had not moved for "adequate protection" and Debtors had simply segregated and banked the $648,000, that sum would serve as <u>additional</u> collateral to the above $7,259,232 in property. Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. Pshp. (In re Ambanc La Mesa Ltd. P'ship.), 115 F.3d 650, 654 (9th Cir. 1997). Suppose the Plan paid the $648,000 to Harvest immediately upon confirmation. That in essence is how the "adequate protection" should be treated here, that is, as a paydown of the actual secured claim that had correlatively increased by each dollar received post-petition, thereby resulting in a "wash," Arden, 248 B.R. at 169-170, with no further credit against other collateral values appropriate.

Debtors, however, rely on First Fed. Bank of California v. Weinstein (In re Weinstein), 227 B.R. 284 (9th Cir. BAP 1998). There, the court credited adequate protection payments against the value of the debtor's residence, which served as collateral. However, the cash was unencumbered. The court made a point of distinguishing unencumbered from encumbered cash used to pay adequate protection:

> In support of its contention that the $98,000 should have been credited toward its unsecured claim, the Bank cites various cases that deal with the treatment of rent payments made to an undersecured creditor. These decisions are not applicable here because Debtors' residential property does not generate

---

[5] $90,000 + $4,080,000 + $549,000 + $52,750 + $2,487,482.

MEMORANDUM OPINION-5

> rent or other income upon which the Bank has a claim. Residential mortgage payments are payments on the Bank's lien. They are not rent <u>or other cash collateral</u>.

<u>Weinstein</u>, 227 B.R. at 297, n.15 (emphasis added).

Debtors have nevertheless argued that such principles only apply to cash collateral generated by rents and the like, and not to cash generated from proceeds of pre-petition inventory, as here. However, the key to the analysis is not the source of post-petition cash collateral, but rather whether it is subject to § 552(b). If it is, payment of adequate protection from what is already cash collateral should not be deducted from the collateral remaining as of the plan's effective date. <u>See</u>, <u>Geisjel</u>, 480 B.R. at 265-268 (applying "addition approach" to dairy sales proceeds).[6] Indeed, <u>Weinstein's</u> reference to "other cash collateral," 227 B.R. at 297, n.15, supports the conclusion that not only "rents" come within the "addition approach."

The remaining alleged credit is the $90,000 paid as settlement of the third party claim in the adversary. The parties have not sufficiently briefed, nor has the Court sufficient facts to determine, whether Harvest has a pre-petition perfected security interest covering the settlement proceeds, and thus whether § 552(b) applies. The Court will defer ruling on this issue, to be decided in the claims allowance process. Because a relatively small sum is involved, this will not affect confirmation, and for feasibility purposes, the Court finds that Harvest has a $7,259,232 actual secured claim.

The other issue in this context is whether Debtors are paying the present value of Harvest's actual secured claim as of the effective date. § 1129(b)(2)(A). This simply requires Debtors to pay interest at the market rate if there is an efficient market, and otherwise at the "prime plus" rate endorsed by <u>Till v. SCS Credit Corp.</u>, 541 U.S. 465, 124 S. Ct. 1951 (2004). <u>Grogan</u>, 2013 WL 1788024 at *3. The Plan proposes a

// // //

---

[6] To the extent the cash proceeds represent post-petition appreciation in the tree inventory's value, Harvest may capture that value. <u>See</u> <u>F.D.I.C. v. Jenson (In re Jenson)</u>, 980 F.2d 1254, 1259-1260 (9th Cir. 1992) (secured claim included collateral's post-petition, pre-confirmation, appreciation); <u>Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship</u>, 248 B.R. 668, 686 (D. Mass. 2000) (same).

MEMORANDUM OPINION-6

6.5% annual rate. Harvest has not contested that rate, and indeed it is the one set previously by the Court. Id. at *5. Based on the above, the Plan complies with § 1129(b)(2)(A)(i) and/or (iii).[7]

Retention of Lien on Sale Proceeds:

The Plan proposes to pay Harvest all net proceeds from the sales of real property and merchantable timber. Section 1129(b)(2)(A)(ii) allows a Chapter 11 plan to propose free and clear sales, so long as the secured creditor's lien attaches to the proceeds. Harvest argues, without authority, that the Plan violates this provision by paying costs of sale ahead of its lien. The argument puts the cart before the horse. Without escrow, realtor, recording, and other like costs and fees, there would be no sales and hence no proceeds for a lien to attach to. To hold that these costs cannot be paid first would effectively write § 1129(b)(2)(A)(ii) out of the Code. See In re Nagy, 2013 WL 364649, *7 (Bankr. W.D. Pa. 2013) (payment of net proceeds after sales costs satisfies § 1129(b)(2)(A)(ii)). It is universally recognized that the sale of assets, especially real property, necessarily requires payment of associated costs such as real estate professionals' commissions, escrow fees, local recording fees, unpaid taxes, and so forth. (Any lienholder would have to pay the same costs if it acquired the property.) Since the purpose of allowing sale free of liens is to allow a debtor to liquidate assets and preserve value, a lienholder may not thwart the process by refusing to allow proceeds of a sale authorized by the Code to be applied to necessary costs of sale.

Indubitable Equivalence:

When a plan uses cash collateral for purposes other than paying down the secured debt, the indubitable equivalence requirement of § 1129(b)(2)(A)(iii) requires assurance that any remaining collateral will cover any remaining actual secured claim should the plan proponent default. Grogan, 2013 WL 1788024 at *6. "In

---

[7] Presently the Plan amortizes Harvest's payments on its actual secured claim at 6.5% and also pays Harvest as a Class 6 unsecured creditor. However, due to the § 1111(b) election, Harvest will be paid solely on its full claim, with no unsecured deficiency. As such, the Plan should simply amortize the full claim at an interest rate that equals the 6.5% being paid on the actual secured claim. This necessitates a lower rate because of the higher principal. See Grogan, 2013 WL 1788024 at *5, n.14. When the full claim amount and the amount to be credited on the actual secured claim, are determined in the claims process, the Plan should be modified accordingly. If a dispute arises, the parties may request a hearing.

MEMORANDUM OPINION-7

shorthand, the creditor's collateral must remain adequately protected throughout. The creditor's risk exposure cannot increase because of the use of its collateral." Id.

Unlike its predecessors, the Plan greatly limits Harvest's exposure to risk and protects its secured position. First, all tree proceeds not being paid to Harvest or senior liens, are being funneled back into the farming operations, which in turn preserve and increase the tree inventory's value. That is a far cry from diverting Harvest's collateral to pay (what is now approaching $575,000) in Debtors' attorney's fees, as proposed in earlier plans.

Second, the Plan moves sale dates up significantly, and perhaps of equal importance, proposes the sale of appreciably more property. The pending sale is of particular note. Although Debtors moved to approve it under § 363, such approval is unnecessary because the Plan itself allows for the sale. After payment of costs and prior liens, Harvest will net approximately $1,262,477. This large and immediate payout will reduce Harvest's risk, as it will cut off accruing interest and taxes, as well as maintenance costs for the sold seedlings. As to the sale's merits, Debtors' realtor, Mr. Giegerich, gave uncontradicted testimony that the $1,385,000 price was the result of a "strong" offer which was only slightly below the listing price. An appraisal commissioned by Harvest confirms that Debtors are indeed obtaining fair market value for the parcels. The Court will thus approve the sale as part of the confirmation process. Harvest will be given until September 23, 2013, to submit an upset bid, which may be by credit and need not exceed the current sale price by any particular amount. The Plan's "effective date" will be changed to September 30, 2013. The sale is to close by October 1, 2013, with all necessary documents, including deeds, executed and transferred as of that date.

The Plan also decreases risk in other significant ways. It moves the balloon payment up four years from the previous plan so that it now predates by two and a half years the pre-petition balloon dates for which Harvest bargained. In so doing, Harvest is being paid earlier and its collateral is less exposed to farming's inherent risks. Further, the Plan increases the regular payments over prior plans and consequently decreases the balloon payment. To ensure "hard" payment deadlines, the payment amounts and dates set forth in Exhibit 39 are minimums to be met on pain of a Plan default (after the Plan's cure period), with the yearly

MEMORANDUM OPINION-8

interest-only and then amortizing payments adjusted to reflect the actual secured claim as found by the Court. The balloon payment should also be adjusted to the amount necessary to retire Harvest's secured claim.[8] As further assurance, and to protect against a possible Chapter 22, Debtors must agree that upon default, Harvest is entitled to relief from stay as to its collateral (to the extent the stay is still in place post-confirmation), and such relief must be binding in any subsequent Chapter 11, 12 or 13 case. Further, Debtors must sell the remaining 160 acres of the Canyon parcel within the Plan's sale deadline for the rest of the parcels.

Finally, economic conditions now support decreased risk and secured claim protection. Eight months have passed since the last confirmation hearing. Tree prices are trending up and the Plan's projections now appear conservative. For instance, Debtors actual tree price for 2013 is $.22 above the predicted price. Further, judging by the price obtained in the pending sale, the rural real estate market also appears to be trending upwards.

Based on the above, the Court finds and concludes the Plan provides Harvest with the indubitable equivalent of its actual secured claim.

**Demeter's Treatment**:

Demeter Ag., LLC (**Demeter**) is Debtors' second largest secured lender with filed claims totaling $890,424.80. It is secured by a first lien on both the North Livingston parcel and Debtors' equipment. Its junior liens on other collateral have no value. The Plan values Demeter's actual secured claim at $300,000 ($170,000-North Livingston; $130,000-equipment) and proposes to pay it with proceeds from sale of North Livingston plus annual payments over 5 years at 6.5% interest. Unless Demeter elected § 1111(b) treatment, the deficiency (approximately $590,424) would be paid as part of the Class 6 general unsecured claims. Demeter is impaired. It did not vote on the plan and thus, because it is the only member in its class, has rejected it. § 1126(d).

// // //

// // //

---

[8] Exhibit 39 computes the balloon on a smaller actual secured claim than found by the Court.

MEMORANDUM OPINION-9

Minutes before the August 28th hearing, Demeter filed a § 1111(b) election.[9] At the hearing Debtor objected to the election as untimely. Although the Disclosure Statement had been approved, the approval was conditional and subject to consideration of objections filed at least seven days before the August 28th hearing. See Doc. #549. Harvest timely filed objections to disclosure. See Doc. #566 at p.3. Under FRBP 3014 a creditor may make the § 1111(b) election at any time prior to the conclusion of the disclosure statement hearing. It follows that the election was timely. The election, however, rendered the plan unfeasible, since it forced the Debtors to pay Demeter's full claim over the Plan's life. Grogan, 2013 WL 1788024 at *3. At the confirmation hearing, Debtors proposed a plan modification whereby they would surrender the North Livingston parcel immediately and either sell or surrender the equipment after the 2013 harvest. They argue that this treatment renders the § 1111(b) election ineffective.

Under § 1111(b)(1)(B)(i), (ii), a creditor may not make the election if its interest in the collateral is of inconsequential value or it has recourse and the collateral is being sold under the plan. Here, Debtors' proposal to "surrender" North Livingston and the equipment is the functional equivalent of a "sale" under § 1111(b)(1)(B)(ii).[10] In re Wandler, 77 B.R. 728, 733 (Bankr. D. N. D. 1987); c.f., Tampa Bay Assocs., Ltd. v. DRW Worthington, Ltd. (In re Tampa Bay Assocs., Ltd.), 864 F.2d 47, 50 (5th Cir. 1989) (right to foreclose is equivalent to "sale" for purposes of § 1111(b)(1)(A)(ii) preventing conversion of nonrecourse claim to recourse). However, cutting off the § 1111(b) election is not without limits. To be a "sale under the plan" under § 1111(b)(1)(B)(ii), the sale/surrender must occur substantially contemporaneously with plan confirmation. See In re Matrix Dev. Corp., 2009 WL 2169717, *5 (Bankr. D. Or. July 16, 2009). Thus the Court will confirm the Plan only if Debtors surrender North Livingston and the equipment within 10 days of entry of the confirmation order.[11] In light of the surrender, the Court need not value Demeter's secured claim.

---

[9] The hearing commenced at 9:00 a.m. on August 28. The notice was filed electronically at 8:51 a.m.

[10] Demeter's other collateral is of inconsequential value due to senior liens. § 1111(b)(1)(B)(i).

[11] Casey Grogan testified credibly that Debtors could quickly find replacement equipment which
(continued...)

MEMORANDUM OPINION-10

That value will be established when Demeter liquidates its collateral. After that process is complete, it should file an amended proof of claim for the deficiency, which will be treated with the other Class 6 general unsecured claims. Alternatively, at Demeter's option, it may accept a deed in lieu of foreclosure for North Livingston and bills of sale for the equipment, in exchange for respective credits of $170,000 and $130,000 against its claim.

Even assuming Demeter would object to the above treatment, "surrender" nevertheless meets the fair and equitable requirements of §1129(b)(2)(A)(iii) as it gives Demeter the indubitable equivalent of its secured claim. RadLAX Gateway Hotel LLC. v. Amalgamated Bank,__ U.S. __, 132 S. Ct. 2065, 2072 (2012) (one example of "indubitable equivalence" is return of the collateral itself).

**Feasibility**:

Harvest argues the Plan is not feasible.

> Feasibility requires only that the debtor demonstrate that the plan has a reasonable probability of success. The Code does not require the debtor to prove that success is inevitable or assured, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility. The debtor [however] cannot confirm a plan that is a visionary scheme which promises more than the debtor can deliver.

> Bankruptcy courts consider several factors when evaluating the feasibility of a plan, including:

>> (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

> If a final payment, in the form of a "balloon" payment, is proposed to come from new financing to be acquired by the Debtor in the form of some new lending vehicle, then proof of feasibility is necessary. Whether that balloon payment can likely be made, and new financing acquired, requires credible evidence proving that obtaining that future financing is a reasonable likelihood.

---

[11](...continued)
could be financed partially with funds originally budgeted to pay Demeter.

In re Grogan, 2013 WL 1788024 at *8 -9 (internal quotations and citations omitted).

Many feasibility issues dovetail into the above discussion as to reduced risk. Harvest argues however that Debtors will fail out of the box because they are cash-strapped. Casey Grogan however countered this argument credibly by explaining Debtors will be receiving advance deposits on 2013 tree sales, which, along with cash on hand will be sufficient to finance the 2013 harvest. See Ex. 14 showing a 2013 cash surplus. In addition, he testified some of the 2013 harvest expenses, like helicopter services and inter-farm trucking, are typically paid in 2014.

The Plan contemplates funding by sale of 695,000 trees over the next six harvests. Harvest argues Debtors will simply run out of trees in the Plan's latter years. That prediction is based on Mr. Steigerwaldt's inventory as well as his predicted annual 5% cullage rate. However, the Court has already adopted Debtor's tree count of almost 892,000 trees before cullage, and it now adopts Debtor's predicted cullage rate of 10% (of the trees originally planted), as opposed to Mr. Steigerwaldt's annual 5% rate. Mr. Steigerwaldt's rate is based on his experience in the industry. Debtors' rate is based on detailed cullage counts by particular field over previous harvests, see Exs. 8, 9, 38, and is more reliable as to their particular farm. While some trees will be sold with the contemplated land sales, the remaining inventory will be sufficient to fund the Plan.

Harvest next contests Debtors' predicted tree pricing, which contemplates sales starting at $12 per tree in 2013 and increasing a dollar per year through the 2018 harvest. Interestingly, Mr. Steigerwaldt predicted a substantially similar progression at the confirmation hearing last January. He has, however, now adjusted his forecast to top out at $14 per tree in 2016 and then decrease to $12. He reasons Debtors will run out of inventory of mature trees and thus be relegated to shorter less valuable "table tops." Alternatively, even if mature trees are available, he believes they will be of a lesser "economy grade," which again would bring a lower price. The Court does not see the evidence the same way. It has addressed the "inventory shortage" argument above. As to a dearth of quality trees, the Court finds credible Casey Grogan's testimony that based on current plantings, there will be sufficient high-quality mature trees in the Plan's latter years. See Ex. 30.

Under the Plan, Debtors still must make a hefty balloon payment, which, given the collateral's value, the Court estimates at over $2.5 million. However, Debtors' Exhibit 10 projects sufficient resources to make

MEMORANDUM OPINION-12

that payment (with some cushion) using tree proceeds, cash reserves, and sale or refinance proceeds deriving from the remaining real property, tree inventory and timber.[12] The Court is well aware it previously questioned Debtors' price and volume projections, as well as their ability to pay the balloon. However, the evidence at the recent confirmation hearing was stronger than at earlier hearings, being based on 2013 actuals and an optimistic tree and real estate market, and, the Plan's term is now sufficiently shorter, so as to allow the Debtors to satisfy their burden of proof respecting feasibility.

One point should be clearly understood: the Court construes the Plan, and many of the Debtor's exhibits supporting confirmation (e.g., Ex. 39 regarding the value of the plan's proposed cash flow) as requiring strict adherence to the schedule of payments contemplated by the Plan and exhibits. The Court's finding that the plan is feasible is based in no small part on this assumption, since allowing too much latitude in the amount and timing of payments makes calculation of the value of the cash flow problematic, and the likelihood of Debtors' successful performance, far harder to predict. The order confirming the plan will require strict adherence to the proposed payment schedule, both as to timing and amount.

**Good Faith**:

Section 1129(a)(3) requires that a Chapter 11 plan be proposed in good faith. "'A plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the Code.'" Marshall v. Marshall (In re Marshall), 721 F.3d 1032, 1046 (9th Cir. 2013) (quoting, Platinum Capital, Inc. v. Sylmar Plaza L.P. ( In re Sylmar Plaza, L.P.), 314 F.3d 1070, 1074 (9th Cir. 2002)). Good faith is measured by the totality of the circumstances. In re Seasons Partners, LLC, 439 B.R. 505, 513 (Bankr. D. Ariz. 2010).

Harvest argues Debtors have breached their fiduciary obligations by milking its cash collateral and refusing a more reasonable plan to sell substantially all assets now. Harvest overlooks that Debtors have paid it almost $650,000 in monthly payments without default, or that they closed the Sunnyview sale at an above-appraisal price, and paid Harvest almost half a million dollars in net proceeds. Further, Debtors have conscientiously filed their monthly operating reports and provided Harvest considerable additional financial

---

[12] The refinancing would be at 50% of each parcel's value, as consistent with the evidence at the January confirmation hearing.

MEMORANDUM OPINION-13

information. When confronted with the Court's view that a 10-year plan could not be confirmed, Debtors made appropriate adjustments and came back with a shortened plan that downsized operations and provided for quicker payment. That responsiveness is another indicia of good faith.

At bottom line, Harvest doesn't believe Debtors, or for that matter any debtor with no equity, deserves a chance to reorganize and keep operating. The Court disagrees. The Code holds no such restrictions. Its other provisions as discussed above build in protections. Debtors deserve a chance to reorganize. Their current plan "achieves a result consistent with the objectives and purposes of the Code." Id. The Plan has been proposed in good faith.

**Discharge**:

The Plan provides that upon entry of the confirmation order Debtors will receive a discharge. Plan at ¶ 8.5. In so providing, Debtors are attempting to invoke an exception to the general rule in § 1141(d)(5)(A) that individual Chapter 11 debtors receive their discharge upon completion of plan payments. Under the statute, the Court may grant an earlier discharge "for cause," a term left undefined by the Bankruptcy Code. While several courts have addressed the issue of what constitutes "cause," no consensus has arisen. See, In re Detweiler, 2012 WL 5935343 (Bankr. N.D. Ohio Nov. 27, 2012) (collecting cases). In general, the Court agrees with Detweiler that "cause" must be determined based on the totality of the facts and circumstances of each case, Id. at *5, but believes that at minimum, a debtor must show the ability to make plan payments with "a high degree of certainty." In re Beyer, 433 B.R. 884, 888 (Bankr. M. D. Fla. 2009). Debtors did not press the discharge issue at hearing.[13] In any case, the Court finds they have not met their burden of proof. They offered no evidence as to why early discharge was necessary or appropriate. Further, while the Plan is feasible, Debtors have fallen short of showing they will be able to make the payments with a "high degree of certainty." Id. As such, the early discharge provision will be stricken.

---

[13] At the January 2013 hearing on Debtors' Second Amended Plan, Debtors maintained they were seeking early discharge for tax reasons. See Tr. of Jan. 16, 2013 Confirmation hearing at 16:2-17:7. They acknowledged, however, that to obtain an early discharge the case law required a showing of a "high likelihood of success under the plan." Id. at 17:2-5.

MEMORANDUM OPINION-14

**Conclusion:**

The Plan will be confirmed with the modifications referenced above. An Order Confirming the Plan consistent with the Court's findings, and its interpretation of the plan, has been entered contemporaneously with this Opinion. This Opinion constitutes the Court's findings of fact and conclusions of law under FRBP 7052.

FRANK R. ALLEY, III
Chief Bankruptcy Judge

MEMORANDUM OPINION-15